## PARAMOUNT TEXTILE MACHINERY CO. v. SNYDER.

(Circuit Court of Appeals, Third Circuit. March 2, 1926.)

No. 3376.

Patents ⊜328.

Flick patent, No. 1,075,346, for a hosiery finishing board claims 3 and 4, *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit by the Paramount Textile Machinery Company against Florence E. Snyder, executrix. Decree for defendant (1 F.[2d] 995), and plaintiff appeals. Affirmed.

Edmund H. Parry, of Washington, D. C., and Charles H. Howson, of Philadelphia, Pa., for appellant.

Fraley & Paul, of Philadelphia, Pa. (Henry N. Paul, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This patent case concerns the art of shaping and drying hosiery. In the antedating practice after hosiery came from the dyeing or bleaching baths and had been subjected to the centrifugal action of a water-extracting machine called a "whizzer," it still remained damp. In that condition it was "boarded" or drawn by an operator over a wooden shape and then placed in a furnace. These successive steps dried, creased, and ironed the stocking and prepared it for packing in attractive form. These shapers were made of wood, and were intermittently saturated with water and subjected to the high ranges of the furnace heat. As a result, they frequently warped, shrank, split, or splintered, and so produced second grade goods. It was to meet this situation that George T. Flick, a practical hosiery maker, applied for, and on October 14, 1913, obtained the patent No. 1,075,346, here in question, for a hosiery finishing board. His specification, after reciting these difficulties, shows he proposed a "novel construction of a novel hosiery finishing board, comprising a metallic body portion and a handle of heat resisting material detachably connected therewith, * * * which are formed of a thin metal sheet or plate and preferably of aluminum or its equivalent. The board is provided on one side near one edge with a groove 4 which is located a desired distance from an edge of the finishing board. * * * The purpose of this groove is to receive the seam of the stocking or hosiery and prevent the latter from shifting while the stocking is shrinking during the finishing process, and owing to the provision of this groove, my novel hosiery board may be operated without the necessity of employing skilled labor." On this specification, claims 3 and 4, which read, respectively:

"3. A hosiery finishing board having a single groove on one side in proximity to its rear edge and extending from the leg portion to the end of the toe portion.

"4. A hosiery finishing board consisting of a thin metallic sheet conforming to the

shape of the stocking and having a single groove in its side substantially parallel with the rear edge of the board,"

—were granted and are here in question.

This patent, in the several years following its issue, not only made no impress on the art, but for some reason, the boards described in it were very little, if indeed at all, used. Some years later, the two companies here involved, both of which were engaged in manufacturing hosiery machinery, without knowledge of Flick's patent, and wholly independent of each other, developed machines for simultaneously drying, creasing, and shaping hosiery on a large scale. Instead of an individual handling an individual board, and instead of such board being thereafter taken to, and later removed from, a drying furnace, a number of hollow, internally steam or electrically heated shapes, more or less oval in form, and provided with sharp, crease-shaping edges, are banked uprightly on a working table. The operator stands in front of the table, rapidly slips the wet stocking over one of the oval shapes, without allowing her hands to touch the shaper, which is heated to some 250 degrees Fahrenheit. She then pushes the fabric sideways until the seam abuts one side of the rear edge of the shaper. By such machines the damp stocking is adjusted, dried, and creased in one operation and place, and removal to, and use of, the dry box and press of the old art are eliminated. The process is so rapid and the shaper so hot that the whole operation is completed in half a minute. Indeed, the placing of the stocking was done so quickly, and it was dried so fast, and placing, shrinking, and drying so substantially concurrent, that, were the shapes provided with the Flick groove, it would obviously be impossible to use it for the functional purpose noted in his specification, namely: "The purpose of this groove is to receive the seam of the stocking or hosiery and prevent the latter *from shifting while the stocking is shrinking during the finishing process.*" In the machine it is the rapid, deft work of the operator that puts and keeps in place the hosiery, while creasing and drying are going on, which was not the case in the tandem process of Flick where the stocking was first seam-grooved and creased, and then dried in the furnace. In the development of these machines, the Flick patent had no part, but the plaintiff thereafter bought it and charged the defendant with using the groove of its claims. The court below held such was not the fact and dismissed the bill. After full consideration, we find no error was thereby committed. As we have said, Flick's patent made no impress on the art, and for some reason its use was negligible. It is therefore given all the patent protection it merits by confining it to the channeled, or two-sided, rectangular bottomed groove it disclosed. But the defendants, in their machine, and for that matter the plaintiffs, in theirs also, in spite of their ownership of Flick's patent, do not have such a channeled, two-sided groove, or indeed any indented hollow that can be called a groove. The sharp edge of defendant's shapes shade off by a beveled drop in contour, but a drop which has neither the sharp, angular edge, or the indented depth of Flick's groove or channel. To allow Flick's unused groove to be vitalized at this late day, in a machine showing advance along other lines of the art, and in vitalizing it, make it dominate this new machine art would, in our judgment, be to block instead of foster development.

We therefore affirm the decree entered below.